[Civ. No. 1630. Third Appellate District.—March 21, 1917.]

DAVID WHILDIN et al., Respondents, v. MARYLAND GOLD QUARTZ MINING CO., Respondent, and EUREKA GOLD MINING CO., Appellant.

MINING LAW—PATENT UNDER ACT OF 1866—RIGHT TO FOLLOW VEIN.— Under the Federal Mining Act of July 26, 1866, a patent to a lode claim grants the fee of the land including so much of the lode as apexes within the exterior surface boundaries of the land, with the right to follow the vein on its dip, and nothing more.

APPEAL from a judgment of the Superior Court of Nevada County, and from an order denying a new trial. George O. Jones, Judge.

The facts are stated in the opinion of the court.

Chas. W. Kitts, and John Mulroy, for Appellant.

F. T. Nilon, and Nilon & Arbogast, for Plaintiffs and Respondents.

Fred Searls, for Defendant and Respondent.

BURNETT, J.—The action was one to quiet plaintiffs' title to a small parcel of mining ground lying easterly of and adjoining the surface boundaries of defendant Eureka Gold Mining Company's patented land, known as the Eureka quartz mine. The land claimed by plaintiffs is designated as East Eureka quartz mine, and is an irregular shaped parcel surrounded on all sides by patented mining claims. Plaintiffs claim that, on the fifth day of September, 1897, the land embraced within the exterior boundaries of the East Eureka quartz mine was public mineral land of the United States, open to exploration and purchase; that, on said date, one Stephen Maynard, a citizen of the United States and the predecessor of the plaintiffs in interest, having discovered a lode or vein of gold-bearing rock in place within the exterior boundaries of said parcel of land, made a valid mining location of said parcel, to be known as the East Eureka quartz mine, that the labor and improvements necessary in order to hold said mining claim under the federal mining laws were done and performed each year by said Maynard and the plaintiffs as his successors in interest. There is no controversy as to the technical formality of said location, the posting of the notice, the marking of the boundaries or the performance of the necessary labor to hold the claim.

Appellant Eureka Gold Mining Company claims only a portion of the land embraced within said location, and it bases its claim to this upon a certain mineral patent, dated September 13, 1869, issued by the land department of the United States to the Eureka Gold Mining Company for lot No. 41 in the northeast quarter of section 26, township 16 north, range 8 east, M. D. M., containing 23.29 acres, together with the lode 1,664 feet in length. This patent was based upon a location of one thousand seven hundred feet of the Eureka ledge, made December 9, 1865, as indicated by the following:

"Notice of Location.

"Notice is hereby given that the undersigned have this day located and taken up for mining purposes, seventeen claims of one hundred feet each on the quartz lode or vein known as the Eureka ledge situated upon Eureka hill, about one mile easterly from the town of Grass Valley, Nevada County, California, commencing at a point on said ledge at which this notice is posted, forming the westerly boundary of the claims of the Idaho Mining Company, and extending thence westerly seventeen hundred feet upon and following the said Eureka ledge to a large pine tree forming the eastern boundary of the claims of the Rowanaise Company, with all the dips, spurs, angles and variations of said ledge."

About 164 feet of the Eureka ledge or lode attempted to be granted by appellant's mineral patent lies outside of and beyond the exterior surface boundaries of plaintiffs' mining location, and the right of ownership of these 164 feet of said ledge presents the important issue in the case.

The determination of this matter involves, of course, the question whether this particular part of the lode was subject to location on September 5, 1897, when the predecessor of plaintiffs gave notice of his claim; in other words, whether it was then a part of the public domain. This must depend upon the consideration whether appellant's patent to lot No. 41 and 1,664 linear feet of the Eureka ledge carried and conveyed that portion of the strike which lies beyond the exterior surface boundaries of said lot. If it was operative to vest title to said portion, manifestly, appellant must prevail; otherwise, the order of the trial court must be affirmed.

Respondents' position is "that the Eureka patent granted the fee of lot No. 41 including so much of the Eureka lode as apexed within the exterior surface boundaries of said lot, with the right to follow the vein on its dip *and nothing more;* and that as to the portion of the lode which lies beyond the exterior boundaries of lot No. 41, the patent is invalid and inoperative." Furthermore, it is contended that "appellant has the choice of two courses. Either it could rely upon its old location and possessory right of so many linear feet along the ledge, with its attendant burdens of annual labor, etc., without certain and defined surface rights, or it could proceed to patent, have its lode and selected surface ground officially

surveyed and platted, and receive from the government a mineral grant for something certain and defined, thus relieving itself from the burdens mentioned and making certain what was theretofore indefinite. Appellant chose the latter course and it must abide its choice.''

We think there can be no doubt, under the decisions, of the correctness of respondents' view of the case. If the patent had been issued under the statute of 1872 even appellant would probably not contest the proposition affirmed by respondents, but no different conclusion can be reached from a proper interpretation of the law of 1866 under which appellant claims, although said statute is not so explicit and certain as the later enactment of Congress.

The second section of the Federal Mining Act of July 26, 1866, provides: ''Whenever any person claims a vein or lode of quartz, bearing gold, having previously occupied and improved the same according to the local customs or rules of miners of the district, and having expended in labor and improvements thereon an amount of not less than one thousand dollars, etc., it shall be lawful for said claimant to file in the local land office a diagram of the same, so extended laterally or otherwise as to conform to the local laws, customs and rules of miners, and to enter such tract and receive a patent therefor, granting such mine, together with the right to follow such vein or lode, with its dips, angles and variations, to any depth, although it may enter the land adjoining, which land adjoining shall be sold subject to this condition.'' The use of the terms ''entry'' and ''tract'' clearly implies a surface location, and it is the ''tract'' for which the patent is granted. The language is opposed to the contention that the patentee may claim the ledge on its course or ''strike'' beyond the extreme boundaries, although he may follow the lode on its ''dip'' beyond the lateral lines. It makes no difference what the actual location may have been, or what is permitted by the local mining rules or customs. The statute prescribes the measure for the issuance of the patent, and the muniment of title therein authorized cannot be extended or enlarged by any act of the administrative officers of the government.

That the patent must be thus defined and limited in its operation has been decisively stated by the courts. One of the early cases is *Wolfley* v. *Lebanon Mining Co.*, 4 Colo. 112. There the patent to what was known as the ''Ben Harding''

lode was issued under the act of 1866 and contained the following language: ''It being the express intent and meaning of these presents to convey to the said J. Warren Brown, his heirs and assigns, only the eight hundred linear feet of the Ben Harding lode, with surface ground hereinbefore described, commencing at the discovery shaft of said lode, and extending thence westerly eight hundred feet along the course of the vein, the same being known as claims Nos. 1, etc., . . . with the right to follow said Ben Harding lode or vein to the distance of eight hundred linear feet, with its dips, angles and variations, to any depth, although it may enter the land adjoining.'' In reference to the claim of the right to follow the vein in its course beyond the exterior boundaries of the surface location the court said: ''It is, however, insisted that if not by the literal terms of the act of July, 1866, then by virtue of territorial legislation and local customs and rules of miners, the patentee was entitled to follow the course of the discovered lode, whether it was comprised in his location or not; that one of the purposes of the act of Congress was to recognize and confirm mining rights and titles as they existed under local laws and customs; that whatever may be the true construction of the act as to locations made subsequent to its passage, as to locations made prior thereto, it authorized the issuance of a patent for a lode located in conformity with the rules and customs of the mining district in which it was situated, even though it might depart in its linear course from the lateral boundaries of the described premises.'' After a reference to the status of the claimant and possessor before the issuance of the patent, the court declares: ''A title in fee, by patent, is offered him, which he may, at his pleasure, accept or reject. By the statute his rights are circumscribed and determined. The act of Congress, from which they sprung, is paramount to all local rules, laws and customs. . . . It is in the light of its provisions that every patent issued in pursuance thereof must be construed, and we cannot, therefore, admit that any such patent can, by virtue of local laws and customs, transfer to the patentee any greater interest or estate than that which the paramount law warrants.'' Quoting from the opinion of Judge Sawyer in the case of *Chapman* v. *Toy Long*, 4 Sawy. 34, [Fed. Cas. No. 2610], to the effect that the locator has the choice of remaining in the possession of the mine and developing and appropriating

its mineral deposits, or of taking steps to purchase it and secure a patent therefor, it being a matter left to his own option or sense of self-interest, the court proceeds to say: "The patent operates to convey not only the circumscribed tract of land which, under the claimant's direction, he has platted, but also the lode contained therein, with the right to follow the same in its downward course into adjoining premises, *but not to follow it when, on its downward course or strike, it departs from the vertical side-lines. In the latter case, after its departure, it is the subject of location by whomsoever it may be discovered.*" It was therefore held that the plaintiff was not entitled to the portion of the lode in its course beyond the patented side-lines. The case was, manifestly, carefully considered and ably expounded by the Colorado supreme court.

Two interesting and noted Utah cases are also brought to our attention, both involving the same question.

In *McCormick* v. *Varnes*, 2 Utah, 355, the notice of location covered some two thousand two hundred feet of the lode and the patent corresponded with it, but only about one hundred feet were covered by the surface boundaries, and it was held that the patentee in his title was limited to this description, the court declaring that "it is clear that the government did not intend by the act of Congress of July 26, 1866, to authorize the miner to locate, or itself to grant, two separate and distinct estates in a mining location, one in the surface ground, and the other in the vein or lode, wherever the latter might be found to run in its course, without regard to the surface ground." It is pointed out that under the common law the claimant would be entitled only to whatever might be over and under the surface of a segment of the earth, carved out by the extreme lines of the location extended downward indefinitely, and that the said statute of 1866 operated to qualify or enlarge this right in one respect only, and that is, to the extent that the claimant "may follow the lode from the apex found within the surface ground, on its dip to any depth, although in its course downward it may so far depart from a perpendicular as to enter the land adjoining. . . . But he cannot go beyond or outside of his side-lines on the course or strike of the vein."

The other Utah case, *Tarbet* v. *Flagstaff Min. Co.*, went to the United States Supreme Court on appeal and is reported

in 98 U. S. 463, [25 L. Ed. 253], and the rulings of the Utah supreme court similar to those in the McCormick case, *supra,* were upheld. The rule was also laid down that a location made crosswise of a lode or vein, so that its greatest length crossed the same instead of following the course thereof, will secure only so much of the claim as it actually crosses at the surface, and its side-lines will become its end-lines for the purpose of defining the rights of the owner. The same theory that is held by appellant herein was embodied in a proposed instruction that was refused by the lower court and the supreme court of the United States declared that the ruling was correct. The proposed instruction was as follows: "By the act of Congress of July 26, 1866, under which all of these locations are claimed to have been made, it was the vein or lode of mineral that was located and claimed; the lode was the principal thing, and the surface area was a mere incident for the convenient working of the lode; the patent granted the lode, as such, irrespective of the surface area, which the applicant was not bound to claim; it was his convenience for working the lode that controlled his location of the surface area; and the patentee under the act takes a fee-simple title to the lode, to the full extent located and claimed under said act." It was declared that the true construction of the act of Congress of 1866 is: "That the owner of a mining right in a lode or vein cannot follow the course of the vein beyond the end-lines of his location extended perpendicularly downward, and that he may follow the dip to an indefinite distance outside of his side-lines."

The foregoing case is followed in *Del Monte M. & M. Co.* v. *Last Chance M. & M. Co.,* 171 U. S. 75, [43 L. Ed. 72, 18 Sup. Ct. Rep. 895], wherein the subject is learnedly reviewed by the court through Mr. Justice Brewer and it is declared that "the express purpose of the statute of 1866 was to grant the vein for so many feet along its course, yet such grant could only be made effective by a surface location covering the course to such extent."

In *Walrath* v. *Champion Min. Co.,* 63 Fed. 552, the acts of 1866 and 1872 are compared and it is declared by Judge Hawley: "A survey of the surface ground must be made before it can be patented and the surface lines of such survey should be marked upon the ground, whether patented under the law of 1866 or 1872. The intent of both acts, in this

respect, is substantially to the effect that the mining loca-
tions made thereunder should be along the lode lengthwise,
and the surface boundaries should be marked upon the
claim. It was not intended by either act that the locator
would have any right to follow the lode upon its strike beyond
the surface lines of his location. The term 'location' as
used in both acts refers to the surface ground as well as to
the vein or lode. The lode claim, whatever its nature, char-
acter, or extent, is to be limited to the survey of the surface
location, and the title to the lode upon its strike is not given
to any portion thereof which departs beyond the surface lines
of the location.''

*Montana Ore Purchasing Co.* v. *Boston & Montana etc.
Min. Co.*, 20 Mont. 336, [51 Pac. 159], is an instructive case
from Montana, very much in point here. The patent called
for 2.98 acres of land, more or less; ''and 1,318 linear feet
of the said Rarus vein, lode, ledge or deposit of the length
hereinbefore described,'' etc. The court said: ''While it is
often true that the surface of mining ground is often spoken
of in the decisions of the courts as an incident to the vein
whose apex lies within or under it, we are clearly of the
opinion that the mining statutes of the United States contain
no authority for the conveyance of the lodes or veins em-
braced in a located quartz claim independently of the sur-
face ground connected with *and containing or overlying them.
Neither is the subject of patented grant by itself. . . .* What
did the Rarus patent convey? . . . The patent conveys an
area of 2.98 acres and no more. . . . In so far as the patent
attempts to convey the Rarus lode on its strike, independently
of the granted surface of 2.98 acres, it is void and of no
effect.''

Other similar decisions are cited by respondents but the
foregoing would seem to set the matter at rest.

It is true, as pointed out by the Montana court, that certain
expressions are used in the statutes that apparently favor ap-
pellant's position, but the phraseology results from the fact
that the lode is the actual thing in interest and the principal
subject that is contemplated. However, as pertinently de-
clared: ''Such expressions and such provisions cannot avail
to permit the grant of lodes or veins embraced in a located
quartz claim regardless of the surface connected therewith.''
There are certain expressions, also, in some of the decisions

of the courts that lend color to the contention that title to the lode independent of the surface boundaries may be acquired, but they are not to be taken as laying down the law in the premises.

Appellant also seems to find some comfort in certain statements contained in sections 58 and 59 (3d ed.) of Lindley on Mines. It is apparent, though, that the learned author is therein dealing largely with the mining rules and regulations as to the location of claims and with the opinions of the land department of the government. However, when we look at section 60 we find this declaration: ''The courts of last resort have uniformly overruled the interpretation of this act adopted by the land department, and have established the rule that surface lines, both side and end, were contemplated by the act of 1866, and that when a patent was once obtained the patentee was not permitted to follow the vein on its course beyond the surface boundaries.''

Then, in section 71, Judge Lindley compares the two acts of 1866 and 1872 and, in reference to the former, makes this comment: ''The act of 1866 left the manner of locating these claims to local regulation, limiting the linear extent of each individual claim to two hundred feet, except in case of the discoverer, and to a maximum of three thousand feet to an association of persons.

''We have seen that under the local rules locations were made of the *vein* and a given number of linear feet on the course was claimed; also, that prior to patent the locator could follow that vein, wheresoever it might run, to the extent claimed. His surface ground was for the convenient working of his lode, and its extent was regulated entirely by local custom. His right to the vein in length or depth was not dependent upon the form or extent of the surface ground. When he applied for and received a patent, he received title to but one lode, and could only follow that on its course to the extent which it was included within his surface lines. While end-lines were implied, his right to pursue the vein in depth was not based upon their substantial parallelism.'' He then proceeds to state what changes were effected by the statute of 1872, but we need pursue the subject no further.

We may say in conclusion that the principal mistake made by appellant lies in the assumption that the location and the patent are governed by the same rule. As pointed out, the

location, prior to 1872, could be made of the lode without regard to the surface boundaries, but under the patent the locator was limited to the lode within the designated lines on the surface of the ground. When appellant applied for its patent it undoubtedly might have included surface ground for the entire length of the lode claimed by it, but it chose to take 23.29 acres along about one thousand five hundred feet of the vein and no surface ground for the remaining 164 feet, and it filed in the local land office its plat showing such choice.

We feel satisfied that the judgment is just and legal and the order denying the motion for a new trial is therefore affirmed.

Chipman, P. J., and Hart, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on April 20, 1917, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 17, 1917.